CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHIRLEY MACK on behalf of herself and others similarly situated, | ) ) | 1:11-cv-9008 |
| Plaintiffs, | ) | |
| v. | ) ) | Judge Kim (by consent) |
| GENERAL MOTORS FINANCIAL COMPANY, INC. f/k/A AMERICREDIT CORP., | ) ) ) | JURY DEMANDED |
| Defendant. | ) | |

**PLAINTIFF'S REPLY IN SUPPORT OF MOTION TO COMPEL**

The law is that "the creditor should be responsible for demonstrating that the consumer provided prior express consent." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, GC Doc. 02-278, 23 FCC Rcd. 559 (January 4, 2008) ("In re TCPA 2008"). Consent is an affirmative defense, for which the defendant bears the burden of proof. *Thrasher-Lyon v. Illinois Farmers Ins. Co.*, 2012 WL 983774, at *4 (N.D.Ill. Mar. 20, 2012). Providing one's telephone number to a creditor in connection with an existing debt constitutes consent. *In re TCPA* 2008 ¶9.

Plaintiff's class discovery asks defendant to disclose that which the law requires it to know (and prove), in any event: the calls it made, where defendant's records indicate that the number was not provided by the called party in connection with the account being collected. It then asks defendant to explain its defenses as to those calls.

Americredit argues that it should not have to produce records for anyone but plaintiff, because plaintiff cannot prove his motion for class certification yet. But this position puts the cart before the horse: except in rarest cases, a plaintiff nearly *always* needs discovery from

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

defendant in order to prove her motion for class certification.[1] The fairness of compelling such information is even clearer in a case like this one, where the class is objectively defined to include only persons for whom defendant cannot prove its affirmative defense.

Americredit is not only wrong on the law, it is also wrong on the facts. The statements in its affidavit claiming that it only calls cell phone numbers it obtains from credit applications, Kinley Aff. ¶2, and that it cannot "systematically" search for class members, Kinley Aff. ¶3, both appear to be objectively false.

The motion to compel should be granted in its entirety. Defendant should be compelled to produce all responsive materials by date-certain, and should be barred from relying upon or introducing any materials not timely produced.

## A. The Court Should Compel Defendant to Produce Class Data and List, and Disclose its Affirmative Defenses.

As pointed out in plaintiff's opening brief, it is axiomatic that a defendant must provide evidence of its affirmative defenses in discovery. Fed.R.Civ.P. 26(b)(1). Defendant has apparently conceded that it bears the burden of proof in this case of proving that it had "prior express consent" to call plaintiff, but contends that it has no duty to provide any such information for the class because doing so would be unduly burdensome and because it has not yet asserted the consent defense as to anyone other than plaintiff. The final reason Americredit claims to have no duty to provide information about its consent defense, is that plaintiff cannot yet prove the absence of consent. In other words, defendant argues that it does not have to

---

[1] *Oppenheimer Fund v. Sanders*, 437 U.S. 340, 351, n.13 (1978) ("discovery often has been used to illuminate issues upon which a district court must pass in deciding whether a suit should proceed as a class action under Rule 23, such as numerosity, common questions, and adequacy of representation.")

provide any discovery supporting its defense, because plaintiff yet to disprove its affirmative defense.

As explained below, these arguments should not prevail, and the motion should be granted in its entirety.

**1. The Benefit of Production Outweighs the Burden.**

As explained above, providing one's cell number to a creditor constitutes consent to be called. Plaintiff has therefore defined the class in this case in those precise terms: the class consists of persons Americredit called, where its records indicate it did not obtain the number from the person called, with respect to the account being collected. There is a subclass of persons who, like plaintiff, informed Americredit that it was calling the wrong party or sent a cease and desist, and Americredit continued calling in spite of this. It is no wonder that Americredit is resisting despite the discovery rules and decisions: providing a class list is akin to providing a list of persons who, like plaintiff, there exists no consent defense. Proofs as to whether defendant's equipment and recorded messages comply with the TCPA will be identical as to plaintiff and each class member.

The records sought here are important to not only identification of the class, but also the merits of this case for the class members, because defendant has refused to repudiate its affirmative defenses as to those persons. Most of the persons in the class, like plaintiff, have no relationship with the defendant, and likely have no idea that their rights have been violated. Defendant is the sole custodian of the information sought, would like to prevent the class from even attempting to assert their claims, either through this class action or as an opt-out. These

people are entitled to substantial damages, and a permanent injunction against future illegal calls. 47 U.S.C. §227(b)(3).

That the benefit outweighs the burden was the determination of each autodialer TCPA case cited by plaintiff in her opening brief. After all these are Americredits *defenses*, for which it bears a "clear and convincing" burden of proof. *In re TCPA 2003*, 18 F.C.C.R. 14014, 14,079 ¶ 113 & 14,105 ¶150 (July 3, 2003).

Largely ignoring these authorities, Americredit submits the affidavit of Kyle Kinley in support of its burdensome position. The Kinley affidavit attempts to end-run the merits of this case, stating that "It is Americredit's custom and practice to only call cell phone numbers that were provided by customers through loan financing documents or other customer information." Brief at 2; also Kinley Affidavit at ¶2. The affidavit also states, somewhat paradoxically that Amreicredit cannot "systematically" search for persons who, like plaintiff, it called when it did not obtain the number from the called party.

"Account notes" produced by Americredit show that it obtains cellular telephone numbers from sources other than from the debtor's application, and then calls those cell numbers using a predictive dialer. The account notes also demonstrate that systematic, computerized searches for certain types of class members would be easy. In other words, the burden argument is a red herring.

Counsel's experience with reading account notes in debt collection cases such as ███ ████████████████████████████████████ reveals that the first column on those pages represents the "user"; the person or thing that performed the collection activity in that row. The second column shows the date, the third the time, and the fourth is a description of the

action taken. Most of the entries for the first column are capital letters, which appear to be initials, most likely the initials of collection agents working for Americredit, through Insurex.

However, the notation "gc" in the first column appears only where telephone calls are made, including on ███████████████████████████ The notation "gc" typically refers to calls made by a Guaranteed Contacts dialer made by Ontario Systems, Inc. E.g. *Powell v. West Asset Management, Inc.*, case no. 1:10-cv-7852, 773 F.Supp.2d 761, 763 (N.D.Ill. 2011)(see also *Powell* Docket Entry 18, p. 44, deposition testimony explaining that "GC" in collection notes indicates Guaranteed Contacts predictive dialer calls); also <u>Exhibit G</u> (The Guaranteed Contacts system's outbound dialing modes include Predictive, Progressive preview and Unattended, enabling you to tailor your activity to your clients' needs.")

Using this typical, and logical, description of the document leads to the following description of events: ████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

        ████████████████████████████████████

███████████████████████████████████████



It would be easy for Americredit to perform a search of its records for iterations and approximations of "wrong number" and "cease and desist." Some examples might be, "WRG NBR," "STOP CALLNG" and "CEASE." From those files, Americredit could determine which were which it called after having been notified. Its claim that it cannot systematically figure out who is a class member is simply false.

---

[2] ███████████████████████████████████████████████████ ███ suggests that the GC dialer may have been used in "preview mode," which means that the dialer made the call automatically, but not as part of a dialing campaign. See Exhibit G. These calls, too, would be covered by the TCPA because it is the "capacity" to dial numbers without human intervention that matters, rather than the mode in which calls were made. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, GC Doc. 02-278, 23 FCC Rcd. 559 (January 4, 2008); *Griffith v. Consumer Portfolio Services, Inc.*, no 10-cv-2697, 2011 WL 3609012 (N.D.Ill. Aug. 16, 2011). Discovery will show that GC dialers qualify as automatic telephone dialing systems.

Similarly false are Americredit's affidavit's claims in ¶ 3 that it does not autodial any phone numbers that it did not obtain directly from the called party. Its own records demonstrate that it ███████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Furthermore, if the affidavit were true about a policy of not calling any number other than those obtained through loan documents, it is puzzling why Americredit would refuse to provide a response to interrogatory 2, which asks directly for the sources where Americredit obtains numbers it calls. And if there is a "policy" of only calling cell phone numbers obtained from financing agreements, how can it be that Americredit has not produced a single piece of paper that documents this supposed policy? None of the policy documents produced mention cellular phones at all.

Plaintiff should not be forced to litigate in the dark. She asks that the Court compel all class discovery, and require defendant to produce such by date-certain, with sufficient time in the discovery period for plaintiff to issue follow-up discovery requests and ask deposition questions as to the production, if necessary.

**2. Americredit Should Either Formally Repudiate and Disavow any Consent Defense, or Provide the Discovery.**

Everyone knows that this case is about consent; the Court even mentioned this during the initial status hearing. Nevertheless, Americredit argues that it should not have to provide information concerning consent because it has not yet formally pleaded consent as to the class members, and because it claims not to be able to figure out where it obtained the phone numbers it called using its dialers.

The defendant in *Donnelly v. NCO* made a similar argument, which was summarily rejected by Judge Guzman after defendant filed a Fed.R.Civ.P.72 objection to Judge Nolan's decision located at 263 F.R.D. at 503-04. The District Court stated:

> NCO also says class-wide discovery on its prior express consent defense, including plaintiff's requests for putative class members' credit applications, is inappropriate because it has not asserted that defense to the class claims. True, given that a class has not yet been certified. But NCO has asserted the defense to plaintiff's claims, has not disavowed it as to any class claims and has been ordered to proceed with class discovery. Thus, NCO's failure to raise a defense to inchoate claims is not a basis for denying plaintiff this discovery.

*Donnelly v. NCO Fin. Sys, Inc.*, 2010 WL 308975 (N.D.Ill. Jan. 13, 2010). Plaintiff will certainly withdraw the consent defense discovery in this case if Americredit repudiates each of its fourteen affirmative defenses as to the class members. But it has not, and is not expected, to do so.

Instead, Americredit is expected to argue that the *possible* existence of a consent defense prevents class certification, even though it has refused to provide any information at all regarding such. The Court should not permit such gamesmanship: as Judge Keys said, a defendant in this situation should be compelled to either "put up or shut up." Appendix at ECF page 105. Americredit should be compelled to provide full responses. If it decides to provide nothing, it should be barred from asserting its affirmative defenses, including consent.[3]

### 3. Americredit's Rule 23 *Prima Facie* Proof Argument is Inappropriate.

In section B of its opposition brief, Americredit argues that plaintiff is not entitled to class discovery because she cannot prove her motion for class certification. This argument seeks to turn this discovery motion into a class certification motion. It also unfairly attempts to

---

[3] Although there is a inference of numerosity here, in the event that Americredit provides nothing, plaintiff's counsel would be more comfortable with an admission that there are more than forty class members; sufficient to satisfy the requirements of Fed.R.Civ.P. 23(a)(1).

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

fault plaintiff for not "proving" the absence of *its own affirmative defenses* as part of her motion, when it is the proof of affirmative defenses about which plaintiff seeks to learn. This was the determination in each of the courts to have considered the situation here, including *Fike*, *Donnelly*, *Balbarin*, *Mack* and *Martin*.

Furthermore, defendant's documents make a prima facie case for certification because they reveal *two* likely class members: plaintiff and the owner of the ████ cellular telephone. Americredit's production easily and objectively identifies plaintiff's phone number as a ████

████████████████████████████████████████████████████

█████████████████████████████████

Similarly for the ████ phone number, the records produced by Americredit show that it obtained the number from █████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████

In the event that the Court finds the burden upon defendant to outweigh the benefit of finding the class members, plaintiff points out that she has requested documents regarding the class members and affirmative defenses. See Document Request 3. The Court could order defendant to produce an over inclusive data set, tailored as narrowly as defendant is able to create, and let plaintiff "sort it out," either manually or systematically.[4] Of course, plaintiff will

---

[4] After all, this is what the document requests ask for, anyway. Plaintiff's counsel made this proposal during the April 2, 2012, telephonic Rule 37.2 meeting, but Americredt declined, opting to stand on its objection that class discovery is not appropriate. Plaintiff's counsel will have to meet and confer with an ESI specialist as to ensure that the formatting of the data is comprehensible, usable and efficient. Americredit would also have to provide all information

<u>not</u> agree to formulate or "prove" Americredit's affirmative defenses for it; doing such is Americredit's burden. But this solution would permit plaintiff to demonstrate that a class exists, while at the same time reducing the supposed burden identified in the Kinley affidavit to zero, but for its affirmative defenses which it claims not to have raised at all.

In sum, the class is objectively identifiable, and plaintiff has made a *prima facie* showing that there is a class from the scant records produced. Defendant's burdensomeness assertions are questionable factually, and the objections are unfounded at law. The motion to compel should be granted.

### B.     Americredit Should be Compelled to Produce the Remainder of the Materials Sought.

There are a host of other discovery requests that Americredit has failed to adequately answer:

Doc. Req. 5 and interrogatory 2 ask for documents and information concerning policies of where defendant obtains cellular telephone numbers. Aside from the now debunked "policy" described in the Kinley Affidavit, none of the documents produced mentions this, which begs the question: how do employees know what company policy is regarding cellular telephone numbers, if the policy is not commemorated through some writing? Americredit is hiding the ball, and an order compelling it to comply with discovery is appropriate.

Int. 3, 10 and 11: Information concerning dialers: The Court has in the record on this motion the entirety of information produced by Americredit regarding its dialers. While plaintiff is familiar with Livevox and does not need clarification as to that dialer company, counsel has

---

available to it that would help plaintiff interpret the data, such as means to decipher database fields and codes.

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

never heard of EPRO before. Despite three interrogatories asking for such, Americredit has not provided any information about this company other than that which is found on Bates 86.

Furthermore, as noted above, it appears that Americredit's agent ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████ this call is easily apparent from the documents produced by defendant, and although Americredit has already produced a sworn interrogatory response that was supposedly true and complete, see Mot. Compel, ECF pp. 110-115, it claims to have had "no idea" whether that call was autodialed.

Americredit's position that Livevox, EPRO and Guaranteed Contacts are not responsive to an interrogatory such as number 11 asking for third parties involved with use or implementation of your Dialer, which specifically *mentions Livevox as an example of the type of information plaintiff seeks*, cannot have been made in good faith. The Court should compel defendant to provide full responses to the interrogatory, including identification of the specific information sought.

Similarly, plaintiff asked for documents concerning the legality and propriety of using a dialer and prerecorded message. These materials bear on willfulness. Americredit's objection that the request is not relevant to plaintiff's individual claims is completely bogus: knowledge of the law before making any calls at issue, individual or class, bears on willfulness. *Claffey v. River Oaks Hyundai, Inc.*, 494 F.Supp.2d 976, 978-79 (N.D.Ill. 2007). Americredit's objection that the information is "confidential" was alleviated months ago when plaintiff agreed to keep all

documents produced as confidential "attorney's eyes only" until a protective order was entered.[5]

All of the cases cited by Americredit relate to the sanctity of privilege. Plaintiff has no quarrel with those cases. But in this case, defendant is abusing the privilege, and is refusing to even acknowledge the existence of specific privileged documents. This is a far cry from producing a log that fairly describes the documents so that plaintiff can fairly assess whether the privilege has properly been invoked. Americredit has held its so-called privilege so close to its chest that neither the Court nor plaintiff has any idea whether any document or information might possibly meet the requirements for being privileged: (1) whether legal advice was sought from a professional legal adviser in his capacity as such; and (2) whether the communication was related to that purpose and made in confidence by the client, and (3) does not fall into an exception, such as third party disclosure. *Sandra T.E. v. South Berwyn School Dist. 100*, 600 F.3d 612 (7th. Cir. 2010). Americredit has intentionally prevented plaintiff and the Court from assessing any of these factors by refusing to produce a log. It has therefore waived the privilege. *Donnelly*, 263 F.R.D. at 504-505.

If there are no documents that exist that relate to the propriety and legality of using a dialer and prerecorded message, then Americredit has nothing to worry about, and an order that it has waived privilege will have no meaning.[6] However, to the extent that such documents do exist, and Americredit still has not produced a privilege log, or even a vague description of

---

[5] Also responsive to these requests would be any dialer manuals or other documents that describe how the dialers work. No such documents have been produced.

[6] On May 2, 2012, Americredit produced a two-entry privilege log, poorly describing apparent redactions from two documents it has already produced. This log is located in the record at the end of Exhibit F.

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

what it is withholding, after multiple requests and a motion pointing out the deficiency, the Court should find that it has willfully waived any privilege relating to these documents.

Complaints and Testimony: The original response to document request 9 stated that there were no complaints against Americredit for violation of the TCPA. This was false: its lawyer, Chad Fuller, is lead counsel on another class TCPA case in California. Plaintiff learned about this other lawsuit when double-checking whether defendant's responses were true, in investigating this motion. It is difficult to understand the original response as anything other than a lie.

It seems likely that Americredit has still not fully complied. No documents about any other formal or informal complaint relating to autodialers, prerecorded messages or the TCPA have been produced. It appears likely that defendant is hiding behind its forty-two "General Objections," or some other objection. In any event, if there are no more documents, which seems unlikely for a giant corporation that uses autodialers as a systematic collection tool, Americredit should say so under oath; particularly given the above history.

Americredit has produced approximately 130 pages of documents in this multi-million dollar class litigation, ostensibly based upon objections. But none of its objections, including the general objections at the beginning of its discovery responses and the objections that are made within the body of its responses, fairly notify plaintiff of what is being produced, and what is being withheld. Fed.R.Civ.P. 34(b)(2)(C) says that objections must "specify the part and permit inspection of the rest." The objections defendant has asserted are designed to justify withholding of any documents and information it pleases, and to keep plaintiff (and the Court) without any knowledge of what exists and what does not. This pattern persists in its response

to the motion to compel, where it claims that it "has not withheld a single document on the basis of privilege." Brief at 15.

At the same time as it asserts not withholding documents, defendant vociferously argues that it has not waived the privilege, and claims that its kitchen-sink recitation of every conceivable privilege, "attorney-client," "work product doctrine," "critical self-analysis" and "other applicable privileges or reasons for non-production" is sufficient to give fair notice to plaintiff of what documents exist, and why they are subject to a privilege. It is not.

Discovery is not supposed to be a game of blindman's bluff, where the plaintiff has to guess what has and has not been produced based upon scores of inapplicable objections and privilege claims. Goldman v. Checker Taxi co, 325 F.3d 853, 855 (7th Cir. 1963). This kind of gamesmanship should not be permitted. The Court should rule that defendant has willfully waived its right to these privileges by failing to justify them after numerous requests from plaintiff and an opportunity to explain them in writing to the Court. Plaintiff's motion should be granted in its entirety.

## CONCLUSION

For forgoing reasons, plaintiff requests that the Court enter an order compelling Americredit to respond properly and in a straightforward way to her discovery requests, without regard to privilege and without regard to objections.

Respectfully submitted,

/s/Alexander H. Burke

14

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

# BURKE LAW OFFICES, LLC

155 N. Michigan Ave., Suite 9020
Chicago, IL 60601
(312) 729-5288
(312) 729-5289 (fax)
ABurke@BurkeLawLLC.com
www.BurkeLawLLC.com

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

# Exhibit F

CONFIDENTIAL - SUBMITTED IN CAMERA
PURSUANT TO MOTION DOCKET ENTRY 31

# Exhibit G



# ONTARIO SYSTEMS

Client Resource Center

Search site

HOME | ABOUT | SOLUTIONS | PARTNERS | EVENTS | CAREERS | CONTACT

# SOLUTIONS

"My **small agency** needs software that **thinks big**.

Introducing Collect Savvy, software to power your big decisions. Learn more

HOME > AR Management > Contact Management

**Contact Management**
- Val dity
- Verified Contacts On Demand
- Message Delivery On Demand
- GC IVR
- GCFlex

**Partners and Data Service Providers**

**Services**
- Hosted Software as a Service
- Client Services
- Professional Serv ces

**Connect Savvy**

**Results and Best Practices**

**FACS ADVANCE**

**Artiva ADVANCE**

A/R Management News

## Guaranteed Contacts — Debt Management

Guaranteed Contacts is an inbound/outbound contact management system designed with complete integration, to create a highly efficient method of contacting debtors.

Operating as an integrated add-on module to the Artiva, FACS, and Collect Savvy systems, the Guaranteed Contacts system is integrated with the system database and account workflow tools. The Guaranteed Contacts system is designed to maximize account representative productivity by relieving representatives of the dialing function, reducing "wait time," and providing a continual flow of "live" contacts.

## Guaranteed Contacts Benefits:

### Seamless Integration

One of the highlights of the Guaranteed Contacts system is the seamless integration with the Artiva, FACS, and Collect Savvy systems. The need for file transfers or uploads and downloads is eliminated due to the use of one database. Your accounts will no longer get lost or delayed in overnight processing, incomplete or failed transfers, or rebuilding of files.

If any action is taken on an account that resides in a dialing campaign of numbers, the Guaranteed Contacts system automatically removes the account from that campaign. This eliminates potential for harassment from unneeded calls. Keeping management and account representatives in touch with production goals and results is achieved as all activity is online and real time. All Guaranteed Contacts system control is performed from the Artiva or FACS system menus.

The Guaranteed Contacts system offers the ability to have multiple directories in multiple locations served by a single dialer or to have multiple dialers served by a single directory, without any additional software applications. When an account representative's process fails due to operator error or network failure, the GC High Availability software allows for automatic process restart, keeping productivity at its highest.

The Guaranteed Contacts system also provides the ability to change the dialer parameters that control least cost routing, campaign dialing and Call-by-Call Blending without restarting the dialer or rebuilding dialer pools.

### Increase Productivity

Because of its seamless integration with the Artiva, FACS, and Collect Savvy systems, the Guaranteed Contacts system increases the contact rate while account representatives use account information screens. The system's advanced algorithms filter non-live accounts and passes live accounts directly to the account representatives, significantly reducing the cost per contact, as contact rates often increase threefold.

Call-by-Call Blending gives account representatives the ability to continue outbound calling while managing inbound calling simultaneously. Utilizing Automatic Number Identification (ANI) you are able to route calls based on account ownership and perform automated account searches and screen pops on inbound calls.

The Guaranteed Contact system gives you the ability to dynamically record calls and attach the recording directly to the account record, enabling rapid retrieval. Also, historical recordings can be played back directly to the debtor.

Configuration of the Guaranteed Contacts system is flexible enough to adjust the pacing of each campaign for a wide variety of business needs, which can include the need to work accounts as fast as possible, but to never place a contact on hold or hang up on a contact. Through the seamless integration, the response time between the account screen actions and the dialer operations is exceptionally fast when compared to non-integrated dialing engines.

### Enhance Management Control

The Guaranteed Contacts system allows managers to monitor their account representatives call activity by providing tools that include:

## Upcoming Events

### May 2012

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

Jun 2012 >>

### Rip Harris



Join product expert Rip Harris as he discusses the value of contact management within Collect Savvy and the road forward for contact management systems.

"We chose Ontario Systems' Verified Contacts On-Demand product because we knew Ontario Systems would make a successful implementation a very high priority. We knew that Ontario Systems would be very sensitive to any production downtime, and we understood the value of the tight integration built into the core application with their call center solutions."

– Greg Eberly
*Special Projects Manager*
*Regional Adjustment Bureau*

- The ability to evaluate staff production and efficiency either real-time or historically.

- The ability to analyze call statistics along side collection statistics using standard Artiva, FACS, and Collect Savvy reports.

- Campaign/Pool Linking can seamlessly migrate representatives from one campaign to another based on a wide variety of criterion, including campaign penetration or time of day.

- Having complete control over the system parameters and pool selection, maximizing account representative efficiency and productivity.

- Real-time monitoring of account representative performance through the use of the GC Command Center tool in a user friendly graphical format, including features such as; Chat (Coach), Listen, Barge-In, Commandeer, and Whisper during the account representative's live call.

- The ability to redirect projects seamlessly, regardless of which office or directory the projects reside. This is possible because every directory becomes the local directory, with full control over dialer functions through advanced tools such as campaign linking and drag and drop agent functionality in Artiva Manager.

## Increase Efficiency

The Guaranteed Contacts system maximizes efficiency by automatically managing the mix of inbound/outbound calls, always giving precedence to inbound calls. The built-in ACD functionality provides for advanced inbound routing matching client specifications. The system is completely flexible in its account representative connections allowing direct T-1, ISDN or SIP based VoIP.

Dialed Number Identification Service (DNIS) enables you to route calls to the proper account representative group based on specific skill sets or client criteria. The Guaranteed Contacts system also has answering machine detection which immediately identifies operator intercepts or answering machines, and will pass the call to an operator, hang up or leave a recorded message on the answering machine.

The Guaranteed Contacts system's outbound dialing modes include Predictive, Progressive preview and Unattended, enabling you to tailor your activity to your clients' needs. The system's pacing algorithm dynamically adjusts itself to minimize account representative wait time and consumers' hold time. It also has the ability to operate from 1 to 600 dialing pools simultaneously, each with different pacing options.

The Guaranteed Contacts System's inbound capabilities include user-defined skills based routing, inbound call center reporting as well as dynamic Service Level compliance tool. The service level compliance tool will allow your management team to ensure your inbound calls are being answered in compliance to your service standards. If the system predicts that calls will be on hold longer than the thresholds you have established, the system automatically adjusts the number of representatives that receive inbound calls.